AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

*FILED*
*Mark C. McCartt, Clerk*
*U.S. DISTRICT COURT*
*MAR 28 2024*

| | |
|---|---|
| In the Matter of the Search of | ) |
| ***821 North Irvington Avenue, Tulsa, OK 74115.*** | ) Case No. 24-MJ-200-JFJ |
| | ) |
| | ) **FILED UNDER SEAL** |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| **21 U.S.C. § 841(a)(1)** | **Manufacture, Possession, or Distribution of a Controlled Substance** |

The application is based on these facts:
**See Affidavit of SA Sterling Juarez, attached hereto.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Sterling Juarez
*Printed name and title*

Subscribed and sworn to by phone.

Date: 3/28/24

_____
*Judge's signature*

City and state:  Tulsa, Oklahoma

Jodi F. Jayne, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of<br>*821 North Irvington Avenue, Tulsa, OK*<br>*74115.* | Case No. _____<br><br>__FILED UNDER SEAL__ |

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Special Agent Sterling Juarez, being first duly sworn under oath, depose and

state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search 821 North Irvington Avenue,

Tulsa OK 74115, Tulsa County, Northern District of Oklahoma, including

outbuildings and vehicles on the curtilage premises, and any person on the premises

that could conceal firearms upon their person, as further described in Attachment A,

for the things described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C)

and am authorized to request this search warrant because I am a government agent

who is engaged in enforcing federal criminal laws and I am within the category of

officers authorized by the Attorney General to request such a warrant.  I am a

Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives

(ATF). I have been so employed since July 2017. I am currently assigned to the

ATF's Tulsa, Oklahoma office. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510 (7), that is, an officer of the United States empowered by law to conduct investigations and make arrests upon violations of the offenses enumerated in Title 18, United States Code, Section 2516. My primary duties and responsibilities with the ATF are conducting investigations of federal firearms violations and other federal violations.

3. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center as well as the ATF Special Agent Basic Training Academy. During these courses of study, I received training in the investigation of federal firearm and explosive violations. I have been a soldier in the National Guard since September 2006, as a Combat Engineer working with U.S., foreign, and improvised explosives. I have a Bachelor of Science degree in Political Science. As an ATF Special Agent, I assist in conducting investigations into the unlawful possession of firearms. Through training, investigations, and experience, I have taken part in cases relating to the trafficking of firearms, the use and possession of firearms by persons prohibited by law, and the possession of illegal firearms. I am familiar with and have participated in various methods of investigations, including, but not limited to: electronic surveillance, physical surveillance, interviewing and general questioning of witnesses, use of confidential informants, use of cooperating witnesses, use of toll records, and subscribers information. I have also debriefed confidential informants and cooperating witnesses regarding the habits and practices

2

of people engaged in the illegal trafficking of firearms. Furthermore, I have conducted and participated in numerous investigations to include: crime scene investigations, collection of evidence, interviews, and the execution of search warrants.

4. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of United States Code, Section 841(a)(1), Manufacture, Possession, Or Distribution Of A Controlled Substance will be located at 821 North Irvington Avenue, Tulsa County, Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises, and any person on the premises that could conceal firearms upon their person, as further described in Attachment A.

3

**Jurisdiction**

5. "[A] warrant may be issued to search for and seize any property that constitutes evidence of a criminal offense in violation of the laws of the United States." 18 U.S.C. § 3103a.

6. The requested search is related to the following violations of federal law:

    a.  Title 21, United States Code, Section 841(a)(1), Manufacture, Possession, Or Distribution Of A Controlled Substance

7. Venue is proper because the events described in this affidavit took place within the Northern District of Oklahoma.

**Firearm and Controlled Substances Offenses Background**

8. "The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3).

9. "The term 'ammunition' means ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm." 18 U.S.C. § 921(a)(17)(A).

10. Based on my training and experience, I have found that persons prohibited from lawfully possessing firearms and ammunition hide firearms, ammunition and receipts/invoices related to the acquisition and disposition of firearms in all areas of their property, including but not limited to their residence, outbuildings and vehicles.

4

Additionally, individuals who are prohibited from lawfully possessing firearms and ammunition often maintain possession of their illegally possessed firearms and ammunition for long periods of time, often in excess of one year.

11. In my training and experience, one way in which felons typically gain access to firearms is through straw purchases. The straw purchase of a firearm is done when a prohibited person, such as a convicted felon, enlists the help of a non-prohibited person, such as a non-convicted felon, to purchase a firearm in a legal manner such as a purchase from an FFL licensed dealer. When the non-prohibited purchaser or "straw purchaser" purchases the firearm, they fill out paperwork (Form 4473) and state that they are buying the firearm for themselves. It is common for the straw purchaser of the firearm to be related to the presumed or soon to be illegal possessor of the firearm.

12. Through my training and experience, I am familiar with how ammunition is packaged for sale at retail establishments. Based on my training and experience in and around firearms, I know that retailers typically sell pistol ammunition in quantities of 20, 25 and 50 – and also in larger quantities in excess of 50 rounds.

13.  I've also learned through my training and experience that an E-Trace provides information in reference to the purchase of a firearm. The E-Trace provides purchaser information, recovery information, dealer information, and administration information.

14. During the course of my training and experience, I have learned how individuals involved in drug distribution schemes maintain records and conspire to

5

deceive law enforcement as well as rival distributors of controlled dangerous substances. I have learned how individuals who are involved in the distribution of controlled dangerous substances maintain records and secret monies derived from the sale of illegal drugs.

15. Based on my background, training, and experience, as previously detailed in this affidavit, I know:

a.   Drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement. In addition, drug traffickers often use a variety of vehicles, vehicles in the names of others and rental vehicles to prevent detection and identification by law enforcement and to prevent forfeiture of the vehicles;

b.   Even though these assets are in the names of other people, the drug traffickers continue to use these assets and exercise dominion and control over them;

c.   Drug traffickers must maintain a large amount of U.S. currency in order to finance their ongoing drug activities;

d.   Drug traffickers maintain books, computer data and programs, records, receipts, notes, ledgers, airline tickets, money orders, cashier's checks, records of wire transfers, records of purchase of vehicles and property and other papers relating to the importation, ordering, sale, transportation, possession, purchase and transfer of controlled substances;

6

e. Drug traffickers often keep records that are usually recorded in units of weight and monetary value, associated with pounds and kilograms or other such units of measurement and dollar amounts to assist them in their business, records to keep track of amounts "fronted" to customers and money owed by customers for amounts "fronted" by the trafficker; the aforementioned records, books, notes, ledgers, etc., are maintained where drug traffickers have ready access to them, i.e., on their persons, in their vehicles, in or about their residences and places of business. These documents are often kept in code to secret their meaning from law enforcement;

f. It is common for drug traffickers to hide contraband, proceeds of drug sales, financial instruments, precious metals, jewelry and other items of value, and/or proceeds of drug transactions, records and evidence of drug transactions relating to transferring, hiding or spending large sums of money made from engaging in drug trafficking in secure locations on their persons, within their vehicles, within or around their residences and businesses for ready access or to conceal them from law enforcement authorities;

g. When drug traffickers collect proceeds from the sale of drugs, they attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize some, if not all, of the following means; foreign and domestic banks and their attendant services, securities, cashier's checks, money orders,

7

bank drafts, letters of credit, real estate, shell corporations and business frauds;

h. Drug traffickers commonly maintain names, addresses and telephone numbers in books or papers for their associates in the trafficking organization. These books or papers include such items as address books, telephone messages, etc. Shorthand and/or code names are sometimes used for buyers, co-conspirators, sellers, weights and other details of the drug traffickers;

i. Drug traffickers hide and maintain in their residences, storage buildings, barns and outbuildings, places of business, family member's residences and the residences of co-conspirators, financial records which, when analyzed, will show their accumulation and expenditure of money and assets substantially exceeds any legitimate income. I am aware that courts have recognized that unexplained wealth is derived from crimes motivated by greed, in particular, drug trafficking;

j. The books, records, receipts, notes, ledgers, and other items mentioned above are commonly maintained where the drug traffickers have ready access to them and are maintained for long periods of time after the actual event reflected in the documents;

k. Drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their products. These traffickers usually

maintain these photographs in their possession, as in their cellular telephones, iPads, or other portable electronic devices;

l. Drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing drugs. This paraphernalia includes, but is not limited to, scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution;

m. Drug traffickers frequently package illegal narcotics in vacuum sealed bags. Vacuum sealed bags help mask the smell of illegal narcotics, which assists drug traffickers with deterring law enforcement detection. Additionally, mid-level distributors frequently repackage the illegal narcotics they receive from their source of supply ("SOS") into smaller quantities.

n. Drug traffickers often keep handguns, ammunition and other weapons in their residences (including outbuildings), businesses and automobiles to safeguard supplies of drugs and the proceeds of drug sales;

o. Drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement and, in so doing, acquire property, services and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names, and they maintain such documents in evidence of their false identities in their residences (including outbuildings), businesses and automobiles together with evidence of their true identities;

9

p. Drug traffickers commonly conduct a significant amount of their business by using cellular telephones and other telephone systems and normally make frequent calls to conduct, direct, supervise and coordinate their activities.

q. Persons engaged in drug trafficking often carry and possess firearms during and in relation to and in furtherance of their crimes. They also photograph themselves and others with controlled substances, firearms, and money proceeds. Such photographs are often kept in digital form on cell phones. Individuals involved in drug trafficking also trade images of firearms and/or other items used in or derived from their illegal activity on their cell phones;

r. Those involved in domestic or international drug trafficking rely heavily on telephones to communicate with one another in order to coordinate the smuggling, transportation, and distribution of illegal drugs, and they frequently employ coded language and slang terminology in an effort to maintain secrecy while engaging in such communications;

s. Drug traffickers commonly keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences (including outbuildings), businesses and automobiles; and

t. Individuals involved in illegal activities like drug trafficking often generate large amounts of cash from their illegal activities. In order to conceal profits from illegal activities, these individuals employ various types of

financial transactions to disguise and conceal profits. Individuals involved in criminal activities may utilize the facade of a legal enterprise that can be represented as the source of funds arising out of the criminal activity. Individuals involved in illegal activity often physically conceal their funds in locations such as residences, safe deposit boxes, safes or other locations where assets can be physically concealed. Illegal proceeds or assets may also be hidden by placing the assets in third party names including personal property, real property or financial institutions.

16. Based upon my training and experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including, but not limited to, hard disk drives, floppy disks, thumb drives, compact disks, magnetic tapes, memory chips, cellular telephones, iPads and other portable electronic devices. I also know that during the search of a premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific

11

expertise in the type of computer, software application, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. Because of these facts, it is often necessary for computers, cellular telephones, iPads and other portable electronic devices and all related computer equipment to be seized during a premises search in order to conduct a search by Forensic Examiners in the well-equipped and controlled environment of a laboratory setting. If any electronic storage device is seized during the search of the premises described in Attachment A, a separate warrant will be sought before searching those storage devices for data.

17. In my training and experience, as well as my investigation of this case, I know that persons engaged in illicit sales of controlled substances often arrange sales and

re-supply via cellular device, whether through SMS text messages or other applications.

18. I further know individuals who deal drugs use slang terminology for drugs, for example, "fetty" or "fent" for fentanyl, "crystal", "clear", or "ice" for methamphetamine, and "water" for PCP.

19. Investigative databases used by law enforcement and others to conduct person searches, to find addresses, phone numbers and other information include CLEAR and TLO.

## Probable Cause

20. The Bureau of Alcohol, Tobacco, Firearms, and Explosives and the Tulsa Police Department are investigating violent crime and drug distribution in the area of the OYO HOTEL and the TUDOR HOUSE INN, two hotels on either side of Sheridan Road in Tulsa at approximately 35 N Sheridan. From August of 2023 to the end of February 2023, there were at least ten reported incidents of shots fired at either the OYO HOTEL or the TUDOR HOUSE INN and two overdose deaths. From those shooting investigations and other arrests multiple firearms and controlled substances were recovered that are consistent with distribution. As part of the ongoing investigation, law enforcement is aware there are identified and unidentified individuals who are communicating and cooperating in ongoing criminal activity. In addition to the drug and firearms activity, law enforcement has witnessed activity consistent with street level prostitution at the hotels.

21. On November 22, 2023, a thirteen-year-old girl was found deceased of an apparent overdose at the OYO HOTEL. The deceased was found outside one of the rooms without shoes on and not dressed appropriately for the cold weather. This death is being investigated by the FBI.

22. On December 7, 2023, Joseph McKinley PHILLIPS was seen by TPD officers conducting surveillance at the OYO HOTEL. After leaving the OYO HOTEL, PHILLIPS was observed jaywalking across Sheridan Road. TPD officers conducted a pedestrian stop from which PHILLIPS fled on foot but tripped. When PHILLIPS tripped, a pistol dropped from his person onto the ground. A TPD officer caught up with PHILLIPS and a physical struggle ensued. During the struggle, a black fanny pack which PHILLIPS had been wearing across his chest fell onto the ground. Once PHILLIPS was detained, TPD officers recovered a .40 caliber Sig Sauer model P250 pistol bearing serial number EAU013851 from the ground where it had dropped during the struggle, and the black fanny pack. In the fanny pack, police found controlled substances containing mixtures of fentanyl and methamphetamine. Additionally, they recovered from the fanny pack a .45 caliber Glock model 21 pistol bearing serial number BWWL476. PHILLIPS was indicted federally on January 3, 2024, in 24-CR-0006 for two charges of 21 USC 841(a)(1), one charge of 18 USC 924(c), and one charge of 18 USC 922(g)(1).

23. On December 7, 2023, Christopher Valentino WEEDEN was seen by TPD officers conducting surveillance at the OYO HOTEL. After leaving the OYO HOTEL, WEEDEN was observed speeding on the highway, and officers initiated a

14

traffic stop. WEEDEN did not yield, and instead led police on a vehicle pursuit which culminated in losing control of his vehicle and crashing. After getting out of the wrecked vehicle, WEEDEN fled on foot but was apprehended. A 9MM Glock model 43 pistol bearing serial number ACFD359 was recovered that fell from WEEDEN's pants. In the vehicle officers recovered substances that field tested presumptive for a mixture of fentanyl and cocaine. WEEDEN was indicted federally on January 3, 2024, in 24-CR-0007 for two charges of 21 USC 841(a)(1), one charge of 18 USC 924(c), and one charge of 18 USC 922(g)(1).

24. On December 20, 2023, J. H. was found unresponsive in an apparent overdose death in his room at the OYO HOTEL after he had failed to check out of his room as scheduled. T. P., the son of the OYO HOTEL's owner P. P., knocked an entered the room, found J. H., and called emergency services. J. H. was declared dead at the scene.

25. In January of 2024, L.M. was arrested at the OYO HOTEL following TPD officers' observation of an apparent transaction of controlled substances. L.M. was arrested for a state warrant. In a custodial, mirandized interview, L.M. admitted to being a habitual user of controlled substances and said that he gives rides to his dealer, 'Lil Man', to run errands around the area. L.M. said that he often takes 'Lil Man' to a house North of the OYO HOTEL so that 'Lil Man' can pick up more fentanyl to sell.

26. A Federal search warrant executed on L.M.'s phone showed conversations consistent with this activity but did not yield 'Lil Man's' given name.

15

27. Open-source investigations revealed a Facebook profile in the name of 'Lil'man Swerving', with an associated profile picture. 'Swerve' or 'swerving' is street slang in the area for selling controlled substances. TPD officers tentatively identified 'Lil Man' as C.N. While being transported to jail, L.M. identified 821 N Irvington Ave, Tulsa, OK 74115 as the house North of the OYO HOTEL that he often takes 'Lil Man' to.

28. In the course of this investigation, your Affiant had occasion to interview a Confidential Source (CS-1) who identified the house at 821 N Irvington Ave as the home of Lauren GRAHAM and Stacey HORSE. Further, the source confirmed they are involved in the illicit distribution of fentanyl and methamphetamine.

29. CS-1 further said that GRAHAM and HORSE have firearms in the house both for personal use as well as for sale.

30. In February of 2024, TPD officers arrested C.N. during a traffic stop. C.N. was in possession of controlled substances which field-tested presumptively positive for fentanyl and methamphetamines, marijuana, digital scales, and other drug paraphernalia.

31. In a custodial, mirandized interview following his arrest, C. N. was evasive with questions from law enforcement. When challenged with the evidence from his arrest that he was involved with the distribution of narcotics, C. N. shrugged and did not deny his involvement with the fentanyl trade. Further, C. N. confirmed he knows the residents of the house at 821 N Irvington Ave, Lauren GRAHAM and Stacey HORSE. C. N. said that they are into the same things as everybody. Your Affiant

16

clarified, "So, fetty?" to which C. N. said "Yeah." Your Affiant later said "The word I've got is that they're [GRAHAM and HORSE] into larger quantities than just anybody on the street." C. N. said "Right" and nodded.

32. C. N. said that he had seen firearms at GRAHAM and HORSE's house.

33. On March 21, 2024, TPD officers conducting surveillance of 821 N Irvington Ave observed a silver sedan leaving the house at 821 N Irvington Ave with two males, headed North on Irvington Ave and turning left (East) on King ST. Another TPD officer on King ST observed the vehicle (later identified as a silver Hyundai Sonata with Oklahoma license plate NKU286) fail to stop at a stop sign and pulled behind the vehicle in preparation to initiate a traffic stop.

34. After the officer had pulled behind the Sonata, but prior to the activation of its lights and siren or any traffic stop, the officer observed that a dark object was thrown from the passenger side of the vehicle toward the front yard of a house on the Southeast corner of Oxford Ave and King ST.

35. The officer followed as the Sonata turned South on Sheridan RD and activated his lights and sirens to initiate a traffic stop at the QuikTrip gas station at 519 N Sheridan RD. The driver claimed not to have a driver's license, but was subsequently identified as J. B.

36. J. B. appeared nervous to the officer, who asked the passenger if he had thrown anything from the vehicle. The passenger (subsequently identified as Stacey HORSE) denied throwing anything out the window.

17

37. Given the historically high crime in the area, the officer asked J. B. to step out of the vehicle and detained him in handcuffs for officer safety. While placing handcuffs on J. B., the officer asked why he and HORSE were nervous and whether he had any weapons on him or in the vehicle. J. B. stated that he had warrants for fines and there was 'dope' in the car.

38. HORSE was asked to exit the vehicle and was also detained.

39. Based on J. B.'s statement that there was dope in the vehicle, the officer conducted a search of the Sonata during which he discovered a partially closed black glasses case in the center console containing a bag of syringes as well as four loose syringes loaded with a liquid substance. Also in the glasses case were a spoon with white residue on it, a small piece of cotton which appeared wet, and a small plastic baggie containing a white crystal substance which, in the officer's training and experience, appeared to be methamphetamine. The officer seized the suspected methamphetamine and cited and released J. B.

40. Concurrent with the events of the traffic stop on the Sonata, other TPD officers went to the location where the first officer had seen an object thrown from the passenger side of the vehicle prior to the traffic stop. The first officer described it to them as approximately the size of a credit card. These officers located a black zippered pouch approximately 3 inches by 3 inches on the grass between 6412 E King Street and 6406 E King Street. This location was consistent with the pouch having been thrown from the Hyundai. Moreover, the underlying grass was wet from

18

recent rain but the pouch they found was not wet, indicating that it had only recently come to be there.

41. Inside the pouch was:

    a. A large Ziploc-style bag containing approximately 11.37 grams of a white crystal substance consistent with methamphetamine. TPD officers performed a field test on the substance which indicated a presumptive positive for methamphetamine.

    b. Another large Ziploc-style bag containing white crystal-like residue similar to the contents of the first bag. The bag and residue weighed approximately 1.73 grams.

    c. Two small Ziploc-style bags with "#1" printed multiple times on the fronts of the bags, also containing a white crystal-like residue similar to the contents of the first bag. One bag and residue weighed approximately 2.19 grams and the other weighed approximately 2.09 grams.

    d. Another small Ziploc-style bag containing approximately 2.18 grams of a white crystal substance.

    e. Four empty small Ziploc-style bags

42. Based on my training and experience, this packaging and weight is consistent with the sale or distribution of methamphetamine.

19

## Conclusion

43. Based on the information above, I submit that there is probable cause to

search 821 N Irvington Ave, Tulsa, OK 74115, including outbuildings and vehicles

on the curtilage premises, and any person on the premises that could conceal

controlled substances and/or firearms upon their person, as further described in

Attachment A, and seize the items described in Attachment B.

44. I request to be allowed to share this affidavit and the information obtained

from this search with any government agency, to include state and local agencies

investigating or aiding in the investigation of this case or related matters, and to

disclose those materials as necessary to comply with discovery and disclosure

obligations in any prosecutions from this matter.

Respectfully submitted,

_____

Sterling Juarez
Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives (ATF)

Subscribed and sworn to by phone on March 28th, 2024.

_____

JODI F. JAYNE
UNITED STATES MAGISTRATE JUDGE

20

## ATTACHMENT A

### Property to be Searched

The property to be searched is a single-family residence located at 821 N Irvington Avenue, Tulsa, OK 74115, Tulsa County, Northern District of Oklahoma, further described as a white house located on the East side of Irvington Avenue with approximate Google Maps coordinates of 36.1671023865709, -95.91197809701782. When faced from the curb, the house has a covered carport on the left side with a garage door behind it. The white paint on the house is chipping off and the surface under it is gray. There is a circular arrangement of paving stones in the yard with a decorative birdhouse in the center. There is also a white lamppost in the yard to the right of the carport. There is a ramp leading from the carport to the front door, which is red and has a white wrought iron screen door. The number "821" is posted to the left of the front door as well as on the curb at the right side where the driveway meets the street. There are large bushes reaching almost to the eaves on the right side of the front door. There are large bushes reaching almost to the eaves on the right side of the front door. The property to be searched includes outbuildings and vehicles on the curtilage premises.



## ATTACHMENT B

### Particular Things to be Seized

All items that constitute evidence, instrumentalities, contraband, and/or fruits of violations of Title 21, United States Code, Section 841(a)(1), Manufacture, Possession, or Distribution of A Controlled Substance, including:

a. Documents showing ownership of real or personal property;

b. United States Currency or items reflecting drug proceeds;

c. Books, records, receipts, notes and other papers relating to the trafficking of narcotics even though these documents may be in code or in a different language other than English or in electronically stored data;

d. Contraband, including controlled substances, proceeds of drug sales, records of drug transactions, drug sources, drug customers, and other tangible items evidencing the obtaining, secreting, transfer and/or concealment of assets and/or money obtained through or used in the transportation, distribution, and sale of narcotics, including but not limited to drug or money ledgers, buyers lists, seller lists, recording of sales and any corresponding records of account receivable, money paid or received, drugs supplied or received, cash received to be paid for controlled substances or intended to be paid for controlled substances, whether in paper form or electronically stored data on computer discs, cellular telephones, or other storage media;

e. Items of personal property tending to establish the existence of a narcotics conspiracy including but not limited to personal telephone bills, photographs and documents and other items reflecting names, addresses, telephone numbers, and communications;

f. Paraphernalia for distributing, packaging, and weighing narcotics. Equipment and materials used in the building or using concealed compartments;

g. Articles of personal property tending to establish the ownership of the property in question, including telephone, rent receipts, keys, utility company receipts, papers, documents, letters and cancelled mail envelopes;

h. Records of mail and communication services for cellular telephones and other communication devices which evidence the participation in a conspiracy to distribute narcotics;

i. Any and all appointment calendars;

j. Bank statements, loan applications, money drafts, letters of credit, money orders, cashier's checks, bank checks, safety deposit box keys, vault keys, safes, any and all documents relating to banking activities and other financial transactions including the purchase of real estate and documents showing ownership of real estate;

k. Records relating to employment, wages earned and paid and other compensation records. Records relating to local, state and federal personal

and business income, sales and service taxes, including but not limited to, computations, notes and records used for tax purposes;

l.  Evidence of proceeds including items relating to maintaining, secreting, gathering or liquidating drug proceeds, particularly: financial records of withdrawals, funds transfers, purchases, sales, transfers or consolidation of assets. Liquid assets or evidence of them including currency, bank statements, money drafts, letters of credit, money orders, cashier's checks, pass books, precious metals and jewelry, and documents relating to safe deposit boxes, stocks, bonds and other financial instruments;

m. Evidence of the expenditure of money for the purchase of vehicles or evidence establishing an ownership interest in vehicles, including certificates of title, vehicle tag records, photographs and receipts of vehicle transactions;

n.  Cellular telephones;

o.  Electronically stored data on cellular telephones or other electronic storage devices, such as PDA's or electronic organizers;

p.  Electronic memory chips or storage chips or SIM cards used in cellular telephones and the data and information stored thereon. Computers and data storage devices including discs, drives, CD's and DVD's and the electronically stored data thereon. The electronically kept information or data stored on electronic storage devices, computers or PDA's whether in

files or disc, drives, in memory storage devices, in the drives or other electronic storage medium. E-mail, text messages or other notes or records whether financial or otherwise, accessible by computer or other communication services stored in files on hard drives, drives, CD, DVD, in the drives, or other electronic storage medium or device; and

q. Firearms, ammunition, and articles associated with the possession, ownership and use of firearms including, boxes, receipts, holsters, clips, and equipment.

No seized cellular phones, storage media, or other devices containing electronically stored information will be searched without obtaining another search warrant for the data therein.